## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CALEB L. MCGILLVARY | ) | CIVIL ACTION NO. |
| PKA "KAI THE HITCHHIKER" | ) | |
| PLAINTIFF | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| ROLLING STONE, LLC, | ) | |
| MARLOW STERN, WENNER | ) | |
| MEDIA, LLC | ) | |
| DEFENDANTS | ) | |

*(RECEIVED NOV 27 2023 PRO SE OFFICE stamp)*

## COMPLAINT

## PLAINTIFF REQUESTS A JURY TRIAL

# I. PARTIES IN THIS COMPLAINT
## A. PLAINTIFF (*PRO SE PLAINTIFF IS INCARCERATED*)
NAME: Caleb L. McGillvary, publically known as "Kai the Hitchhiker"

STREET ADDRESS: #1222665/SBI#102317G NJSP Po Box 861

COUNTY, CITY: Mercer, Trenton

STATE & ZIP CODE: New Jersey 08625

TELEPHONE NUMBER: N/A

## B. DEFENDANTS
DEFENDANT NO. 1

NAME: ROLLING STONE, LLC

STREET ADDRESS: 475 5th Avenue

COUNTY, CITY: New York, New York

STATE & ZIP CODE: New York 10017

TELEPHONE NUMBER: Unknown

1

DEFENDANT NO. 2
NAME: MARLOW STERN
STREET ADDRESS: 50 Horatio St., Apt 4
COUNTY, CITY: New York, New York
STATE & ZIP CODE: New York 10014
TELEPHONE NUMBER: Unknown

DEFENDANT NO. 3
NAME: WENNER MEDIA, LLC
STREET ADDRESS: 475 5th Avenue
COUNTY, CITY: New York, New York
STATE & ZIP CODE: New York 10017
TELEPHONE NUMBER: Unknown

## II. BASIS FOR JURSIDICTION

This Court has jurisdiction under 28 U.S.C. 1332 over plaintiff's state law claims. Plaintiff is a resident of New Jersey and Defendants are citizens of New York. The amount in controversy exceeds $75,000.

## III. STATEMENT OF CLAIM

A. The events giving rise to these claims are believed to have occurred at Defendants' places of residence and/or business address in or around New York, NY

B. These claims accrued on or about January 8, 2023

C. The facts giving rise to these claims are as follows:

### INTRODUCTION

__1__.) The Rolling Stone is no stranger to this Court. As one of the most well-known publications in America, they've become somewhat of a cultural icon. In recent years, however, their print-based magazine has lost more and more revenues. Market trends seem to indicate that people are more interested in streaming services than in print-based magazines. Yet Rolling Stone still has the kind of clout that gets the

world's largest streaming service to allow its journalists to watch and write a review for a documentary film, before the film is even released.

Unfortunately, unlike in times past, the Rolling Stone is not in a position to question the narrative of the streaming giant. If Netflix says things are one way, the truth be damned, so says Rolling Stone. If Netflix publishes false attributions of criminality, the Rolling Stone doesn't bother to read the underlying case: they just go with it. Gone are the days where Rolling Stone would never sacrifice the truth to kowtow to an advertiser's bottom line.

Today the Court hears a case where the Rolling Stone, seemingly fearful that Netflix might withdraw their favor, has blindly followed the streaming Goliath into a battle with a modern David. Plaintiff made his name by saving a crowd of people from a large homicidal maniac who attempted to kill them, using his camping axe to thwart the would-be mass murderer.

Plaintiff was a homeless street performer who was hitchhiking at the time. He drank heavily afterwards to deal with his PTSD which was triggered by the incident, in which he had to use what seemed like deadly force at the time to subdue the maniac. Many unscrupulous media types took advantage of Plaintiff's drunkenness and easy-going nature, but when one unscrupulous lawyer drugged Plaintiff's drink and sexually assaulted him, Plaintiff fought back. His conviction thereafter for homicide has in no way diminished his reputation for stopping the maniac, who was an admitted rapist. Even after 10 years.

Enter Defendants. Throwing journalistic integrity to the wind, they published provably false slander maligning Plaintiff for his heroic acts in the hatchet incident. Without checking the Court transcripts, they quoted a Fresno cop contradicting his fellow officers, who were actually at the scene (he wasn't); to impute criminal conduct against Plaintiff. Oblivious to reason, they stated that Plaintiff "laced a joint" as if it were a fact; then in the next breath parenthesized that toxicology results said otherwise, as though toxicology results are not reliable as a narcissistic sociopath whose stated purpose was to "Kill it, take Kai's crowd, like Rock Band."

But most disturbingly, they falsely portrayed Plaintiff as being at fault for his traumatic childhood (the original source of his PTSD): calling him an arsonist, prone to fits of rage. Journalists normally contact the subject of their article, asking for information, providing an opportunity

to respond to such allegations. It's a standard journalistic practice which Rolling Stone used to follow, back before Netflix said "jump." Now they simply ask "How High?"

If they had bothered to follow standard journalistic practices and afford the subject an opportunity to respond, Plaintiff could have pointed them to documentary and other evidence proving the falsity of the libelous and false light statements. But Rolling Stone no longer has the financial independence that their print-based magazine once had. They are now dependent on the favor of Netflix, who can decide whether the Rolling Stone or one of their competitors is the first to review their documentaries. They have sacrificed their once great reputation sycophantically echoing Netflix as it smears Plaintiff's. And Plaintiff is having none of it. This lawsuit ensues.

## People v. Jett Simmons McBride

2.) Plaintiff Caleb L. McGillvary ("Plaintiff") relies upon the Court Record of <u>People v McBride</u> No. F13901235 in the California Superior Court of Fresno County; and of <u>People v McBride</u> No. F068949 in the Court of Appeal of California, 5th Appellate District; and incorporates same by reference herein. Specifically, Plaintiff makes reference to the following facts adduced at trial:

a.) Nelson Pereira ("Nelson"), Kenneth Simon ("Kenneth"), and Nicholas Starkey ("Nicholas"); all eyewitnesses to the events of February 1, 2013 at the intersection of Marks and McKinley in Fresno, California ("The incident"); each testified under oath that they could see into Jett Simmons McBride ("McBride")'s car leading up to and including the incident. They each saw that, immediately before McBride intentionally crashed his car into a crowd of power line workers, McBride had both his hands on the steering wheel; and that Plaintiff had his hands in front of himself in his lap. Neither McBride nor Plaintiff were communicating with each other, and Plaintiff was completely in the passenger compartment of the car, with no part of himself in the driver's compartment.

b.) Kenneth, Nicholas, and two other eyewitnesses to the incident; Ginger Miller-Barraza ("Ginger") and Tonya Baker ("Tonya"); each testified under oath that they observed McBride's conduct immediately after the collision but before Plaintiff smashed him in the head with a hatchet. They stated that McBride was continuing his assault on Rayshawn Neely ("Rayshawn"); yelling that he was "sent to take

[Rayshawn] home; that "I am God. I am Jesus. I was sent here to take all the niggers to heaven"; that "all niggers need to die"; "death to all niggers"; and "I will kill you all."

c.) Nelson, Nicholas, Ginger, and Tonya each testified under oath that, subsequent to McBride's expression of deadly intent in " 2 .)b.)"; McBride grabbed Tonya in a "bear hug" and was escalating force against her rapidly. Plaintiff loudly warned McBride 3 times to release Tonya. McBride yelled, "I'll kill you all"; then Plaintiff used his camping hatchet with force 3 times on McBride's head in defense of Tonya

d.) Fresno County Sheriff's Officer Lyman testified under oath that, when officers arrived on the scene, McBride yelled "I did it! Get off of me! I'll kill you all!"

e.) Laboratory analysis of the marijuana smoked by Plaintiff and McBride prior to the incident revealed that there was "no substance in the plant material other than the active ingredient in marijuana."

f.) Blood was drawn from McBride at the hospital immediately after the incident. Tests on the blood were negative for every drug except for marijuana.

g.) McBride admitted to Jeff Stricker ("Stricker") that he "did it"; and when Stricker asked McBride whether he hit the truck on purpose and tried to kill Rayshawn, McBride responded in the affirmative, and explained that he did so because Rayshawn was Illuminati, and expressed remorse

h.) McBride admitted during his sworn testimony that he told Stricker that he "hit the truck on purpose and tried to kill Rayshawn." He denied doing it because Rayshawn was black, but agreed he did it because Rayshawn was Illuminati. He confessed to having Illuminati delusions long before having met Plaintiff.

i.) Plaintiff was found by law enforcement at the scene to have used justified force in defense of others; was cleared of any wrongdoing in the incident; and was released without any charges or reprimands.

## COUNT ONE: DEFAMATION

3.) On January 8, 2023, the Rolling Stone, a publication owned and operated by Defendant Rolling Stone, LLC ("Rolling Stone"), which itself is owned by and is an alter ego of Wenner Media, LLC, published an article ("article") written by Defendant Marlow Stern ("Stern"); entitled "DARK TALE: A Hatchet-Wielding Hitchhiker Went Viral. Then He Killed Someone." Within this article, Rolling Stone and Stern

published the following libelous false statements with constitutional malice, that is, knowing their falsity or with a reckless disregard for the truth of the matter:

a.) "Kai began bragging to Fresno locals that he'd handed the driver, Jett McBride, a joint laced with a number of drugs but 'couldn't handle his shit." (A toxicology report found only marijuana in McBride's system)." The innuendo and implication of this false statement of fact is that Plaintiff surreptitiously administered a number of drugs to the driver of a motor vehicle, thereby impairing him and resulting in a collision which injured numerous people, which would impute numerous counts of assault and other felonious criminal acts to Plaintiff; and is also that Plaintiff perjured himself when testifying at the arraignment of Jett McBride in the matter described in " 2 ".

Whereas the truth of the explicit slander, namely accusing Plaintiff of ever having said such things at all is that Plaintiff never, in fact, said any such thing. The Truth of the matter concerning the aforesaid implications are pleaded in " 2 " above, and that it is a matter of undisputed fact in People v McBride, supra; that there was nothing but THC, the active ingredient in marijuana, in either the marijuana itself or McBride's blood stream immediately after McBride attacked people; and that McBride had been floridly psychotic for days prior to ever meeting Plaintiff, and without any drugs. The implication that Plaintiff committed perjury at McBride's arraignment, is proven false by toxicology reports, laboratory analysis of the plant material in the marijuana

b.) "prompting Kai to tell McBride that they were both ghosts, adding 'I bet we could drive through that truck right now and nobody could see us.'" The innuendo and implication of this false statement of fact is that Plaintiff conspired with and exercised undue influence over McBride with the intent of causing physical injury or death to a number of people, which would impute counts of attempted murder, assault, and other felonious acts to Plaintiff, and is also that Plaintiff perjured himself when testifying at the arraignment of Jett McBride in the matter described in " 2 ".

Whereas the truth of the matter of the explicit false statement of fact is that Plaintiff had never said any such thing to McBride, verbatim nor in any other form. The truth is pleaded in "2"; and shows that both Stricker and McBride testified that McBride admitted to intentionally

trying to kill Rayshawn because he was "illuminati"; and McBride testified to having his floridly psychotic delusions long before ever meeting Plaintiff; and 4 eyewitnesses testified that, prior to being struck in the head, McBride continued his violent assault on Rayshawn while loudly stating his intention was to "kill" all "niggers." McBride continued to express his intention to kill "niggers" loudly in the presence of eyewitnesses, never once expressing any belief that they were "ghosts" nor "illuminati"; but rather yelling white supremacist slogans all the way to the hospital and yelling to Sheriff Officers <u>who were actually at the scene</u> "I did it. Get off of me. I'll kill you all." The truth is that Plaintiff was innocent of any wrongdoing and was found to be not culpable for any of the events of February 1, 2013.

These statements were published through the Rolling Stone's online edition of Rolling Stone Magazine to millions of third parties who accessed the article online. These statements were not authorized by Plaintiff, nor were they privileged because of their falsity and the admission by Stern in parentheses that he was aware of the falsity of statement "a" at the time it was made, and the generally known public record described in "_2_" that Stern should have known of, if he had exercised reasonable due diligence expected of journalists and standard to journalists reporting on these kinds of events, which public record shows the falsity of the statement in "b". The article repeatedly refers to Plaintiff by his publicly known name "Kai the Hatchet-Wielding Hitchhiker"; and by his legal name, "Caleb McGillvary"; such that the reading public acquainted with the parties and the subject would recognize the statements are of and concerning Plaintiff, and that Plaintiff is the person to whom the statements refer. Online comments regarding the article specifically refer to Plaintiff, showing that readers of the article reasonably understood the statements to be of and concerning Plaintiff. The innuendo of the statements had a precise meaning as heretofore described, that was readily understood by readers of the libel. Both of the libelous statements are capable of being proven false by reference to the records as heretofore described. The libelous statements were reasonably understood by readers to be statements of fact, not opinion. The libel falsely attributes criminal conduct to Plaintiff in the February 1, 2013 incident described in "_2_"; which is libel per se.

__4__.) The false statements in "__3__" tended to expose Plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society; and did indeed have that effect, proximately causing general damages from the libel per se.

__5__.) On or about January 17, 2023, Plaintiff sent Marlow Stern a retraction demand via email, which demand is incorporated by reference and stated, verbatim:

"Dear Marlowe Stern;

I don't know why you'd just republish whatever Jeff Stricker says without calling him out for contradicting his own trial testimony. His own police reports. His own fellow officers. You owed your readers some due diligence in at LEAST looking up "People v McBride" F068949 (Cal Ct. App 2016) ant the same case at the trial level.

While you look at that, you should most definitely read the part about the toxicology. AND the lab results ON THE WEED ITSELF. If they really believe there was some as-yet-untestable substance from Planet Zerpo, they're more than welcome to test the weed instead of making baseless accusations. It's irresponsible reporting to simply republish Gabriel Francisco's slander about me. Even if Netflix did it first (rest assured, I will be suing them for it).

I say "at least" because if you had done REAL due diligence, you would've searched P.A.C.E.R. and seen my habeas petition. You would've seen my lawsuit against the rapist's brother for bribing 2 expert witnesses $150,000 EACH (Drug effect expert and Medical Examiner, respectively... I even posted images of the $150,000 check from the estate of the rapist to the drug effect expert, which I discovered through the lawsuit, on my Facebook). You would've found my YouTube channel with my videos describing the *fucking* railroading I got in the county where the rapist was friends with the head judge, head prosecutor, and chief of police.

I mean, sure, not everyone can be Truman Capote. You might never approach Malcolm Gladwell's greatness. But somewhere along the line you seemed to have stopped trying and I'm really sorry for that, man. You should reinvest in the future, and do something they'll thank you for... not regurgitate provably false slander from some wannabe guido douchebag who admitted at the beginning of his interview that his whole purpose was to "kill it, take Kai's crowd, like Rock Band." If

anybody is stupid, gullible, or naive enough to believe him, I'm sorry for them too. Society failed them.

And I haven't seen the second half of the movie yet (video grams take FOREVER to get through on JPay), but you really gotta know who your information is coming from. Have you seen the 2002 NYTimes piece "blue shadows?" How about the recent coverage of Sal Bonnacorso, former police chief of Clark, NJ; and the Union County Good Ole Boys whistleblower Homero Almanzar? Even a cursory look on the bar disciplinary reports of New Jersey will reveal a long standing pattern of lawyers, prosecutors, even assemblyman molesting kids, raping vagrants, and helping each other get away with it. 6 months suspensions for distributing child porn from the prosecutor's office. For real, lookup a prosecutor named "Joseph Haldusiewicz."

Did the UVA article scare you out of calling out rapists or something?

Anyways, I'm really disappointed in the Rolling Stone for not at least editing the parts that contradict "People v McBride" out of your article. And I think you shouldn't be giving up on trying to get on Capote's level. You put prose together very nicely, but you gotta step up your research game. Why don't you start by watching some videos about my case?

[LINK REDACTED]

Sincerely,

Kai"

Notwithstanding this retraction demand, no retraction was made by defendants.

_6_.) Plaintiff's reputation for saving people's lives in the incident described in "_2_" was still strong at the time of the publishing of the Article, with over 20,000 followers on his Facebook page, over 6,000 subscribers on his YouTube channel, and over 10,000 subscribers on his TikTok Account. Plaintiff also has had numerous licensing offers for his endorsement and for use of his copyrighted works in the years since the February 1, 2013 incident, including:

a) In February of 2013, Plaintiff granted "The Gregory Bros." a quality-controlled license to use his name, voice, and likeness to market their auto-tuned song on YouTube and iTunes; at which point the plaintiff agreed to visit and inspect the site of production. In April of 2013, at the soonest practicable time pursuant to this agreement, Plaintiff inspected the site of production in Williamsburg, NY; and ascertained that the

product was manufactured with superb quality. Plaintiff routinely inspects the product on YouTube and iTunes, only to discover that its original excellent quality remains unchanged. Plaintiff has received and continues to receive licensing fees from the use of his marks; since the moment of initial production to the present; and will continue to do so for the foreseeable future. This has benefitted plaintiff approximately $14,000 so far. This remix has continued to be sold at an amazing rate even over a decade later, although the Article has diminished the sales because of its libelous statements which cut to the strength of Plaintiff's marks, marketability of his persona, and value of his copyrighted works.

b.) In October of 2018, Plaintiff entered into a quality-controlled license of his name, voice, and likeness and marks with "Wavy Web Surf"; to market his YouTube channel. In lieu of inspecting the site of production, due to impossibility because of plaintiff's incarceration, plaintiff inspected the script of the video and approved it for production. In consideration of this, Wavy Web Surf paid plaintiff the sum of $2,700 and included advertisement of a link to plaintiff's token crowdfunding platform; which raised approximately $11,300 therefrom to date. Plaintiff has not received any offers for licensing of his marks, celebrity endorsement or copyright protected works since the Article's publication, because of its libelous statements which cut to the strength of Plaintiff's marks, marketability of his persona, and value of his copyrighted works.

c.) Plaintiff has licensed his endorsement to the fundraisers "Go Fund Me" and "Go Get Funding" for two separate fundraisers, one of which running from approximately May of 2013-April of 2016, another which ran from approximately August of 2016 - January of 2020; each of which has raised over $10,000 based solely on the strength of Plaintiff's persona and strength of his marks.

Plaintiff therefore pleads special damages in loss to his reputation, persona, and related property rights accruing to him under Cal. Civ. Code 3344 and N.Y. CIV. RIGHTS LAW 50, 51; and to the strength of his marks "Smash, Smash, SUH-MASH!", "Kai the Hatchet-Wielding Hitchhiker", and celebrity endorsement accruing to him under 15 U.S.C. 1125; because of the libelous Article, which diminished the value of the property rights created by those statutes; each of which rights are distinct and encapsulate rights to revenue from endorsements as shown

by "a", "b" and "c" herein pleaded as being worth $14,000 each video, and over "$10,000" in print, even years after the incident described in "2". This damage to his property interest exists separate from any business interest therein, but in the overall value of the property right created by these statutes.

Additionally, Plaintiff pleads special damages in loss to the value of his property interests created by 17 U.S.C. 106, 201 in his copyright protected works, the value of which was diminished by the libelous article:

a.) "Dark Knight of The Soul" Copyright Registration Number PA 2-399-437

b.) "Unmentionable" Copyright Registration Number PA 2-399-439

c.) "This was never a rape trial" Copyright Registration Number PA 2-398-911

d.) "Kai's Magic Muscles" Copyright Registration Number PA 2-398-909

e.) "Smash, Smash, SUH-MASH!" Copyright Registration Number PA 2-398-110

f.) "Smash, Smash, SUH-MASH!" Copyright Registration Number PA 2-398-664

g.) "Movement" Copyright Registration Number PA 2-396-377

h.) "Movement" Copyright Registration Number SR 953-342

This damage to property interests exists separate from any business interests therein, but in the overall value of the property right created by these statutes.

Plaintiff avers that the total diminishment in value of his property rights created by these statutes proximately caused by Defendants' libel would amount to at least $75,000 in the lifetime aggregate value which the libel caused a loss to.

## COUNT TWO: INVASION OF PRIVACY, PUBLIC DISCLOSURE OF PRIVATE FACT/FALSE LIGHT

7.) On January 8, 2023, the Rolling Stone, a publication owned and operated by Defendant Rolling Stone, LLC ("Rolling Stone"), which itself is owned by and is an alter ego of Wenner Media, LLC, published an article ("article") written by Defendant Marlow Stern ("Stern"): entitled "DARK TALE: A Hatchet-Wielding Hitchhiker Went Viral. Then He Killed Someone." Within this article, Rolling Stone and Stern published the false light portrayal and or public disclosure of private

facts with constitutional malice, that is, knowing their falsity or with a reckless disregard for the truth of the matter:

a.) "Those who knew him describe Kai, born Caleb McGillvary, as prone to fits of rage." Whereas the truth of the matter is that no one who actually knows Plaintiff describes him as prone to fits of rage; and in fact, he is known to those he is truly familiar with as self-disciplined and considerate, with compassion for those who are vulnerable or oppressed. And insofar as the statement refers to Plaintiff as a child, it is a public disclosure of private facts of his Post Traumatic Stress Disorder symptoms resulting from horrific childhood abuse that included canings, freezing cold showers, being locked in a room with a deadbolt and blacked out windows, and being sexually molested at a very young and vulnerable age by those in a position of trust. Plaintiff had a reasonable expectation of privacy in these facts, which the Defendants ought to have known prior to publishing them.

b.) "Kai tried to start a fire in the family home and was subsequently sent into foster care at the age of 13." Which is reasonably understood by readers of the article to imply that Plaintiff committed an act of felonious arson at the age of 13, which in the relevant jurisdiction would have been an indictable felony for which Plaintiff would have been charged as an adult. Whereas the truth of the matter is that Plaintiff attempted to commit suicide at 4 years of age; by drinking a bottle of cough syrup and lighting a sleeping bag on fire; because his birth parents told him he "had a demon" and deserved to "burn in hell." The truth is that Plaintiff was never culpable for any acts of arson, much less felony arson which is chargeable as an adult. The truth is that Plaintiff was sadistically abused as a toddler, and for that reason thought hell would be a better alternative than further abuse; and that Jeremy himself had told him regarding the cough syrup, "don't drink that or you'll go to sleep and never wake up."

These statements were published through the Rolling Stone's online edition of Rolling Stone Magazine to millions of third parties who accessed the article online. These statements were not authorized by Plaintiff, nor were they privileged because of their falsity and/or their nature as public disclosures of private facts; which Stern should have known of, if he had exercised reasonable due diligence expected of journalists and standard to journalists reporting on these kinds of events, which due diligence is for the journalist, in keeping with

industry standards and widely-practiced custom in the news reporting industry, to afford the subject of the article the right of review and thereby to elicit a counterpoint for any purported fact or opinion. The article repeatedly refers to Plaintiff by his publicly known name "Kai"; and by his legal name, "Caleb McGillvary"; such that the reading public acquainted with the parties and the subject would recognize the statements are of and concerning Plaintiff, and that Plaintiff is the person to whom the statements refer. Online comments regarding the article specifically refer to Plaintiff, showing that readers of the article reasonably understood the statements to be of and concerning Plaintiff. The innuendo of the statements had a precise meaning as heretofore described, that was readily understood by readers of the libel. The false light statements heretofore described are capable of being proven false by reference to the records as heretofore described. The false light statements were reasonably understood by readers to be statements of fact, not opinion. The false light portrayal described in "b" herein falsely attributes felonious arson for which he would have been tried as an adult to Plaintiff, which is libel per se.

__8__.) The false portrayal and/or public disclosure of private facts described as the statements in "_7_" tended to expose Plaintiff to public contempt, ridicule, aversion, or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society; and did indeed have that effect, proximately causing general damages thereby.

### COUNT THREE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

__9__.) Plaintiff repleads "_3_"-"_8_" as stating, when liberally construed, a claim for intentional infliction of emotional distress.

### Punitive Damages

__10__.) On or about _1_/_17_/_23_, Plaintiff sent retraction demand to Stern at his email address, which retraction demand specified the offending statements with particularity, as described in "_5_" above.

__11__.) Plaintiff repleads "_3_"-"_9_" as showing that all captioned Defendants, acting jointly, engaged in knowing and intentional tortious actuated by constitutional malice with slander and libel designed to trigger Plaintiff's PTSD. all captioned Defendants, acting jointly's

conduct against plaintiff was for their own pecuniary gain at the expense of Plaintiff's reputation and property-interests. Plaintiff asks therefore for punitive damages against all captioned Defendants, acting jointly, for the sake of example deterring others; and by way of punishing all captioned Defendants, acting jointly, for their own malicious conduct in doing so. To this end, Plaintiff requests punitive damages in the amount of 5 times compensatory, general, and special damages to reflect the egregious and outrageous severity of falsely accusing someone of criminal conduct in a nationally syndicated publication, to which the public should be able to turn to for fact-checked reporting.

## IV PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully prays that this Court enter judgment:

12.) Granting Plaintiff a declaration that the acts of All Captioned Defendants described herein are unlawful and tortious;

13.) A preliminary and permanent injunction ordering All Captioned Defendants to retract the Article described in " 3 " and " 7 " from broadcast on all platforms within their custody or control; and to publish a correction and retraction of the libelous statements with the truth of the matter as described above, on all platforms within their custody or control;

14.) Granting plaintiff general damages, restitution and/or $1,000,000 in compensatory damages against All Captioned Defendants for the emotional distress and mental anguish he suffered as a result  of his PTSD being triggered by Defendants libel; jointly and severally; and special damages as described in " 6 "; for the defamation in " 3 "-" 6 "; jointly and severally;

15.) Granting plaintiff general damages, restitution and/or $1,000,000 in compensatory damages against All Captioned Defendants for the emotional distress and mental anguish he suffered as a result of his PTSD being triggered by Defendants libel; jointly and severally; and special damages as described in " 6 "; for the Public Disclosure of Private Facts or in the alternative False Light Portrayal in " 7 "-" 8 "; jointly and severally;

16.) Granting plaintiff general damages, restitution and/or $1,000,000 in compensatory damages against All Captioned Defendants for the emotional distress and mental anguish he suffered as a result  of his PTSD being triggered by Defendants libel; jointly and severally; and special damages as described in " 6 ";  for the intentional infliction of emotional distress in " 9 "; jointly and severally;

17.) Plaintiff also seeks punitive damages in the amount of five times compensatory, general, and special damages; jointly and severally

18.) Plaintiff also seeks nominal damages of $1

19.) Plaintiff also asks for any other relief this court deems just, proper, and equitable.

I declare under penalty of perjury that all the documents attached hereto are true and accurate copies of the originals.

I declare under penalty of perjury pursuant to 28 U.S.C. 1746 that the foregoing statements are true and accurate to the best of my knowledge and belief.

Executed this _6 TH_ Day of _NOVEMBER_, 20_23_

Respectfully Submitted,

Caleb L. McGillvary, Pro se
#1222665/SBI#102317G NJSP
Po Box 861 Trenton, NJ 08625-0861

16

## CERTIFICATION OF PRO SE LITIGANT

I, Caleb L. McGillvary, hereby certify that I am representing myself in this action. I certify this petition is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

DATE: 11/6/23

_____

Caleb L. McGillvary

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CALEB L. MCGILLVARY

**(b)** County of Residence of First Listed Plaintiff   MERCER, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
PRO SE #1222665/SBI #1023179 NJSP
PO BOX 861 TRENTON, NJ 08625-0861

## DEFENDANTS

ROLLING STONE, LLC, MARLOW STERN, WENNER MEDIA LLC

County of Residence of First Listed Defendant   NEW YORK, NY
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
UNKNOWN

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question *(U.S. Government Not a Party)*

☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*                              Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:   28 U.S.C. 1332

Brief description of cause:   LIBEL, INVASION OF PRIVACY, & IIED

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   DAMAGES

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   2023 NOV 27 AM 11:36

JUDGE _____   DOCKET NUMBER _____

DATE   11/6/23

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 07/16)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CALEB L. MCGILLVARY | ) | CIVIL ACTION NO. |
| PKA "KAI THE HITCHHIKER" | ) | |
|    PLAINTIFF | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| ROLLING STONE, LLC, | ) | |
| MARLOW STERN, WENNER | ) | |
| MEDIA, LLC | ) | |
|    DEFENDANTS | ) | |

## COMPLAINT

## PLAINTIFF REQUESTS A JURY TRIAL

## I. PARTIES IN THIS COMPLAINT
## A. PLAINTIFF (*PRO SE PLAINTIFF IS INCARCERATED*)
        NAME: Caleb L. McGillvary
        STREET ADDRESS: #1222665/SBI#102317G NJSP Po Box 861
        COUNTY, CITY: Mercer, Trenton
        STATE & ZIP CODE: New Jersey 08625
    TELEPHONE NUMBER: N/A
## B. DEFENDANTS
DEFENDANT NO. 1
        NAME: ROLLING STONE, LLC
    STREET ADDRESS: 475 5TH AVENUE
    COUNTY, CITY: NEW YORK, NEW YORK
    STATE & ZIP CODE: NEW YORK 10017
    TELEPHONE NUMBER: UNKNOWN



LEGAL MAIL

RECEIVED
NOV 22 2023
CLERK'S OFFICE
S.D.N.Y.

CERTIFIED MAIL

7012 0470 0002 1340 9615
1340 9615

CLERK OF THE DISTRICT COURT
U.S. DIST CT - S.D. NY
U.S. Court House
500 PEARL ST.
NEW YORK, NY
10007
(Pro Se)

RECEIVED
NOV 27 202
PRO SE OFFICE

#0222665/SBI#1023176
NJSP.PO BOX 861
TRENTON, NJ
08625-0861